WILLIAM V. WHELAN [SBN 116372]
wwhelan@swsslaw.com
DEBORAH A. YATES [SBN 315590]
dyates@swsslaw.com
SOLOMON WARD SEIDENWURM & SMITH, LLP
401 B Street, Suite 1200
San Diego, California 92101
(t) 619.231.0303
(f) 619.231.4755

Attorneys for Plaintiff John Simones

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN SIMONES,<br><br>          Plaintiff,<br><br>     v.<br><br>THE JERDE PARTNERSHIP, INC. SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN; COMMITTEE OF THE JERDE PARTNERSHIP, INC. SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN; THE JERDE PARTNERSHIP, INC.; AND UNNAMED DOES 1-10.<br><br>          Defendants. | Case No.<br><br>JOHN SIMONES' COMPLAINT FOR:<br>(1)   Failure to Pay Benefits Due (ERISA);<br>(2)   Equitable Estoppel;<br>(3)   Breach of the Implied Covenant of Good Faith and Fair Dealing (ERISA);<br>(4)   Breach of Contract (Plan);<br>(5)   Declaratory Relief;<br>(6)   Breach of Contract (Bonus);<br>(7)   Breach of the Implied Covenant of Good Faith and Fair Dealing (Bonus). |

Plaintiff John Simones, by and through his attorneys, alleges as follows:

## INTRODUCTION

1.     This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001, et. seq., against the Jerde Partnership, Inc. Supplemental Executive Retirement Plan (the "Plan"); Committee of the Jerde Partnership, Inc. Supplemental Executive Retirement Plan (the "Committee"); and the Jerde Partnership, Inc. ("Jerde" or the "Company") (collectively, the "Defendants").

P:01491710.6:86C94.001

COMPLAINT

2.      Simones was a long-time executive at Jerde and a participant in the Plan. In violation of law, the terms of the Plan, and Plaintiff's legal rights to benefits, Defendants have each deprived Simones of a significant portion of the benefits due under the Plan upon his retirement after 37 years of loyal service.

3.      Defendants have acted in bad faith by ignoring and misinterpreting the terms of the Plan, changing positions on how Simones' benefits are calculated under the Plan with the intent to deprive him of benefits, and by failing to administer the Plan in accordance with its terms and the law.

4.      Simones brings this suit to recover the wrongfully withheld benefits – totaling over $1 million – and to secure other relief to remedy Defendants' violations.

5.      The Company also wrongfully withheld compensation in the form of bonus distributions to Simones in the amount of at least $680,000. Simones also seeks recovery of these damages.

## **PARTIES**

6.      Simones is the former Chairman of the Board and Chief Executive Officer of Jerde. He began working with Jerde in 1983 and remained an employee until he retired effective December 18, 2020 at the age of 64. At the time of his retirement, Simones had worked for Jerde for over 36 years. Simones resides in Redondo Beach, California. Pursuant to sections 502(a)(1)(B), (2), and (3) of ERISA, Plaintiff is empowered to bring this action to secure his promised benefits under the Plan.

7.      Jerde is a California corporation with its headquarters in Los Angeles, California.

8.      At all relevant times, Jerde was the Plan sponsor and the entity responsible for satisfying the Plan's benefit obligations.

9.      Jerde was the "administrator" of the Plan.

10.　　The Committee was the entity that the Company put forward as responsible for administration of the Plan, at least during certain portions of the relevant timeframe.

11.　　The Plan is the plan in which Simones is a participant and through which Jerde becomes obligated to pay benefits to Plaintiff.

12.　　The Plan provides post-retirement income to a limited number of senior executives.

13.　　The Company asserts that the Plan is a "top hat" plan subject to certain provisions of ERISA, including its civil enforcement provisions.

14.　　The terms of the Plan are documented, in large part, in an agreement titled "The Jerde Partnership, Inc. Supplemental Executive Retirement Plan," adopted as of May 1, 2016 per its terms ("Plan Agreement") Exhibit ("Ex.") A.

## JURISDICTION AND VENUE

15.　　This Court has subject matter jurisdiction over this action pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1132(e)(1); (f), and 28 U.S.C. § 1367(a).

16.　　Venue is proper in this district pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1132(e)(2), because the Plan was administered in Los Angeles County, and a substantial part of the events or omissions which give rise to the claims occurred in Los Angeles County, within this district, and because Defendants are located in this district.

## FACTUAL ALLEGATIONS

17.　　Simones first joined Jerde in 1983. An architect / designer, Simones worked under his mentor, Jon Jerde, on the design of the 1984 Los Angeles Olympics venue, and went on to become one of Jerde's lead architects and urban designers, transforming the Company after Mr. Jerde's tenure ended. Simones rose through the ranks and ultimately became Chief Executive Officer, Chairman of the Board, and Design Director.

18.　　Simones announced his retirement in June 2020.

19.     Simones was Jerde's largest shareholder for many years, including when he retired.

20.     In connection with his service and his ownership position in Jerde, Plaintiff was a participant in the Plan.

21.     The Plan is a benefit plan subject to applicable requirements of ERISA.

22.     Because the Plan purports to benefit solely a select group of management or highly compensated employees, it purports to be a "top-hat plan" exempt from some of the provisions of ERISA, such as vesting, funding, and certain reporting and disclosure requirements. ERISA §§ 201, 301 and 401, 29 U.S.C. §§ 1051, 1081, and 1101.

23.     Shortly after Simones announced his retirement, the Company told him his benefits under the Plan would be $3,133,668, which was consistent with his expectations.

24.     Ultimately, Jerde changed its position and informed Simones that his benefits after more than 35 years would be only $2,090,037, or $1,043,631 less than agreed and promised.

25.     Jerde's decision to deprive Simones of over $1 million of benefits and force him to come to this Court for relief, was made in bad faith and should be overturned.

**The Shareholder Agreement and the Supplemental Executive Retirement Plan**

26.     Simones is party to an Amended and Restated Shareholders' Agreement dated January 25, 2010 ("2010 Shareholders Agreement"). A true and correct copy of this agreement is attached as Ex. B.

27.     Prior to 2016, the terms of a sale of Simones' shares upon his retirement would have been calculated pursuant to the 2010 Shareholders Agreement.

28.     In 2016, Jerde's shareholders executed a transaction comprising a number of documents, including: (1) a Second Amended and Restated Shareholders Agreement ("2016 Shareholders Agreement"); (2) the Plan Agreement; and (3) a Rabbi Trust Agreement.  A true and correct copy of those agreements are attached as Exs. D, A, and C to this Complaint.

29.     The Company distributed a "Summary of Shareholders Agreement" that was circulated with both the draft documents as well as with the final executed documents. The summary reads, in part: "The Shareholders Agreement, SERP and RTA are intended to work together. For example, an employee who's [sic] employment terminates may be entitled to benefits under the SERP and RTA, as well as repurchase of their shares under the Shareholders Agreement." A true and correct copy of the Summary of Shareholders Agreement is attached as Ex. E.

30.     Jerde's shareholders adopted the Plan and the 2016 Shareholders Agreement to change the tax consequences of a major shareholder retiring.

31.     Under the 2010 Shareholders Agreement, the Company would not be able to deduct the amount paid a departing shareholder for his/her shares, and therefore would be taxed on such amounts.

32.     However, under the Plan Agreement/2016 Shareholders Agreement, the portion of a payout to a retiring shareholder that was made from the Plan could be deducted from the Company's taxable income.

33.     The only intended change from the 2010 to the 2016 agreements to a retiring shareholder was the tax consequences, not the valuation of the shares themselves.

34.     Mr. Paul Martinkovic, who succeeded Simones as CEO of Jerde, organized the 2016 transaction for the Company. At the time, he was the Chief Financial Officer.

35.     Mr. Martinkovic emailed several shareholders including Simones on May 10, 2016 explaining that the most recent draft of the Plan Agreement includes

the "option for all eight original shareholders to opt for retirement benefits under the SERP, to be paid either the new way or old calculation of book value per original shareholder agreements." A true and correct copy of this email is attached as Ex. F.

36.    The Company reassured the shareholders that they were protected by the Rabbi Trust if Company management in later years has a "change of heart" regarding the payment of benefits.  Ex. G.

37.    Simones was a signatory to the Amended Shareholders Agreement and the Plan Agreement.

**"Full Retirement Benefit" Under the Plan for Long-Standing Shareholders such as Simones are Based on the Book Value of the Company**

38.    The Plan Agreement defines the "Full Retirement Benefit" to be calculated as follows:

> "the greater of (a) the Participant's Average Annual Compensation multiplied by two (2), or (b) the book value of the Company multiplied by the Participant's percentage interest in the Company minus the purchase price for the Participant's Shares under the Shareholders Agreement entered into coincident with this Plan." Plan Agreement ¶ 1.16.

39.    "Prong Two" of this definition (Plan Agreement ¶ 1.16(b)) ("Prong Two") does not appear in earlier drafts of the Plan and was added shortly before execution.

40.    Only shareholders existing as of May 1, 2016 were eligible for "Prong Two."

41.    Simones was a shareholder as of May 1, 2016.

42.    The "purchase price for the Participant's Shares under the Shareholders Agreement entered into coincident with this Plan," referenced in Plan Agreement ¶ 1.16(b), is $200 per share "or such greater amount as shall be determined by the Board in its sole discretion." 2016 Shareholders Agreement (Ex. D) ¶ 1.8.

43.     The $200 fixed price per share under the Plan does not appear in earlier drafts of the 2016 Shareholders Agreement and was added shortly before execution.

44.     The Plan and the 2016 Shareholders Agreement were designed to work together to enable "Prong Two" shareholders to be paid the value of their shares upon retirement primarily through the Plan. The total payment for a "Prong Two" shareholder was to be the same as prior to the 2016 transaction. Only the tax implications, as a consequence of the change to the source of payments, were to change.

45.     Benefits under the Plan for shareholders qualifying for a "Prong Two" calculation of Full Retirement Benefit were based solely upon the book value of the Company, and the shareholder's percentage ownership.

46.     The Plan provided for payments to Simones to be systematically deferred until after his retirement.  The same was true for other participants.

47.     The Company calculated Simones' benefits under "prong one" as $970,546.

**Simones' Benefits Under the Plan**

48.     Simones' Full Retirement Benefit is calculated under Prong Two of the definition in Plan Agreement ¶ 1.16, based on his significant share holdings.

49.     Because of Simones' age plus years in service, Simones' Full Retirement Benefit does not change based on how many years he worked or on any other factor other than his share ownership. Except for the benefits under the Plan, Simones received $200 per share for his stock, regardless of the value of the Company at the time he retired, and the Company purchased his shares.

**Simones' Reasonable Expectations**

50.     On March 17, 2020, before Simones announced his retirement, a third-party consultant to Jerde, CBIZ Retirement Plan Services, Inc. ("CBIZ"), calculated Simones' Full Retirement Benefit as $3.2 million.

51.   CBIZ's March 17, 2020 report was provided to Simones among others.

52.   For years, both before and after execution of the Plan in 2016, the Company communicated to shareholders, including Simones, that "book value" was calculated by subtracting liabilities from assets on the Company's reported Balance Sheet.

53.   Financial reports, including a Balance Sheet, for the 2019 fiscal year (ended December 29, 2019) were completed by Jerde's third-party accountants and accepted by Jerde on approximately May 4, 2020.

54.   Utilizing the 2019 fiscal year Balance Sheet accepted by the Company from the third-party accountants on approximately May 4, 2020, Simones could readily calculate his Full Retirement Benefit as $3,133,668.

55.   Assets on the December 29, 2019 Balance Sheet total $16,578,060.

56.   Liabilities on the December 29, 2019 Balance Sheet total $8,023,994.

57.   Assets minus liabilities on the December 2019 Balance Sheet equal $8,554,066.

58.   Book value based on the December 2019 Balance Sheet equaled $8,554,066.

59.   Mr. Simones owned 925 shares out of 2,525 outstanding shares at the time he announced his retirement, and as of the date his retirement was effective.

60.   Simones' shares represented a 36.633663% interest in the company.

61.   36.633663% of $8,554,066 is $3,133,668.

62.   Simones decided to retire in 2020, in part, based on his expectation of receiving Full Retirement Benefit under the Plan of approximately $3.1 million.

**When Simones Announced His Retirement, He Was Informed
His Benefits Totaled $3,133,668**

63.   Simones gave Jerde notice of his intent to retire in late 2020 on June 22, 2020.

64.     After Simones announced his retirement, the Company's Chief Financial Officer, John Niiro, calculated Simones' Full Retirement Benefit as $3,133,668 based on a book value of $8,554,066. That calculation was circulated to members of the Board of Directors and to shareholders.

65.     On July 17, 2020, Jerde's Board of Directors passed a resolution stating that Simones' benefits under the Plan were $3,133,668. A true and correct copy of the Board Resolution is attached as Ex. H (JERDE 1356).

66.     The calculation of Full Retirement Benefit of $3,133,668 was based on the Company's official 2019 Balance Sheet accepted from the Company's outside accountants in May of 2020.

67.     In a report dated August 12, 2020, CBIZ calculated Simones' Full Retirement Benefit as about $3 million after Simones announced his retirement.

68.     CBIZ's August 12, 2020 report was circulated to shareholders including Simones.

69.     The August 12, 2020 report from CBIZ is separate and distinct from the March 17, 2020 CBIZ report.

70.     Simones had reason to believe that as of August 12, 2020 all relevant parties were in agreement that his Full Retirement Benefit was $3,133,668.

**Mr. Martinkovic Causes Jerde's 2019 Books to be Reopened with an Intent to Deprive Simones of his Full Retirement Benefit**

71.     In late August 2020, Simones was invited to a Zoom shareholder meeting. Simones was not surprised the meeting was scheduled to occur by Zoom, because the Covid-19 pandemic was ongoing. When he dialed in, all other Los Angeles-based shareholders were together in person in a conference room. Simones was surprised to see other participants together in a conference room. Simones had not been invited to an in-person meeting, though he was Chairman of the Board and the company's largest shareholder.

72.     Discussion during the late August 2020 meeting caused Simones to suspect that Mr. Martinkovic, supported by Ms. Tammy Poulos, was intending to re-open the Company's 2019 financial statements.

73.     Prior to the late August 2020 meeting, Simones was unaware that there was any issue or dispute with the Company's previously released 2019 financial statements or his Full Retirement Benefit calculable based upon the previously released 2019 financial statements.

74.     Based upon information and belief, the sole reason that Mr. Martinkovic and Ms. Poulos wished to change the Company's otherwise previously settled 2019 financial statements was specifically to lower Simones' benefit from the Plan.

75.     Based upon information and belief, Mr. Martinkovic and Ms. Poulos believed that if Simones' benefit was reduced, they would personally, either directly or indirectly, financially benefit through either increased compensation (based upon additional funds being available in the Company to pay salaries and bonuses and other expenses) or increased benefits to them (due to the increase in the book value of the Company at their retirement due to the retention of the payment that would otherwise have been made to Simones).

76.     Mr. Martinkovic and Ms. Poulos sought to have the Company's 2019 financial statements changed, despite the fact that they had already been released months earlier, and Simones' benefit, based upon those financial statements, had already been communicated to multiple individuals, including Simones, and approved by the Board of Directors.

77.     Section 12.1(a) of the 2016 Shareholders Agreement provides that the Company will provide a Balance Sheet and Income Statement within 120 days after the end of each calendar year, either compiled, reviewed or audited by the Company's outside accountant firm at the Board's discretion. Ex. D.

78.   During all of 2020, Simones was Chairman of Jerde's Board of Directors. He retained that position until his retirement.

79.   Notwithstanding the provision at section 12.1(a) of the 2016 Shareholders Agreement that closes financial statements 120 days after the end of a calendar year, and provides that only the Board can obtain reviewed or audited financial statements, no later than November 2020, Mr. Martinkovic directed Mr. Niiro to procure a "reviewed" statement for 2019 and a new actuarial analysis of the executive retirement plan.

80.   On November 4, 2020, responding to Simones' request for a copy of any preliminary report from the "review," Mr. Martinkovic, by email, refused to release preliminary reports to Simones and stated: "we will only release to you and other shareholders final, official reports."

81.   Mr. Martinkovic's actions in procuring a "reviewed" financial statement for 2019 for the purpose of changing the accepted financial statements essentially re-opened closed financial statements in violation of the 2016 Shareholders Agreement's terms.

82.   Mr. Martinovic's decision to re-open the 2019 financial statements without Board approval was in direct conflict with section 12.1(a) of the 2016 Shareholders Agreement.

83.   Mr. Martinovic's decision to re-open the 2019 financial statements was motivated by a desire and intent to reduce the benefits owed to Simones under the Plan and was conducted in bad faith.

84.   The "new" 2019 financial statements were not completed until November 2020.

85.   The "new" 2019 financial statements that the Company created in November 2020 – over 10 months after the end of the fiscal year – purported to retroactively change the Company's accounting method by adding a liability labeled "Accrued retirement benefits" in the amount of over $4 million.

86.   No liability for "Accrued retirement benefits" had been included in any financial statement since execution of the Plan.

87.   No liability for "Accrued retirement benefits" was contemplated when the parties executed the Plan.

88.   Addition of a liability for "Accrued retirement benefits" was not consistent with the parties' expectations when executing the Plan Agreement or other related documents.

89.   Because book value equals assets less liabilities, the addition of a new liability would reduce the calculation of Simones' Full Retirement Benefit dollar-for-dollar times his percentage ownership.

90.   An addition of a liability in the amount of $4 million would reduce Simones' benefits by $4 million multiplied by his percentage ownership of 36.6337%, or nearly $1.5 million.

**If the Company's Position Were Correct, Simones' Benefits Would Have Dropped Drastically When the 2016 Plan was Adopted – which was Not the Parties' Intent**

91.   The 2010 Shareholders Agreement did not lower the Book Value of the Company for calculation of share purchase price by including a liability for the cost to the Company of purchasing the subject shares.

92.   The majority of the "Accrued retirement benefits" reported in the "new" 2019 financial statements represents a liability related to the payments projected under Prong Two of the Plan, calculated based on share ownership.

93.   If the "new" 2019 Financial Statements are utilized to calculate Simones' benefits, including the liability for Accrued retirement benefits, then his benefits would be significantly less than they would have been under the 2010 Shareholders Agreement.

94.   Yet, the parties agreed that Simones, and other similarly situated shareholders, would not incur a reduction in benefits from the adoption of the 2016 Shareholders Agreement and Plan.

95.   To the contrary, the parties agreed that the amount paid to an individual such as Simones would be unimpacted by the adoption of the 2016 Shareholder Agreement and the Plan, other than the potential tax implications.

### The Company Changes its Position on Which Year Applies

96.   Despite procuring the creation of "new" 2019 financial statements, ultimately the Company did <u>not</u> calculate Simones' Full Retirement Benefit based on the "new" 2019 financial statements. Instead, the Company utilized 2020 financial statements – but using the new accounting method of charging the book value for the "Accrued retirement benefits – even though 2020 was not over when Simones retired.

97.   Simones' employment terminated on December 18, 2020.

98.   Jerde's fiscal year ended December 29, 2020.

99.   Under the Plan, half of a participant's Full Retirement Benefit are due no more than 75 days after retirement.

100.   Internal communications produced by Jerde indicate that the Company intended to calculate Simones' Full Retirement Benefit based on the 2019 financial statements, all the way up until February 9, 2021.

101.   Jerde calculated Simones' Full Retirement Benefit as $2,090,037 based on 2020 financial statements using the (inappropriate) "new" accounting method.

102.   The decision to utilize 2020 financial statements allowed the Company to reduce Simones' benefits while also sidestepping the issue of changing accounting methods in late 2019, retroactively and without Board approval.

103.   The inclusion of an Accrued retirement benefit liability is incorrect and inconsistent with the Parties' agreements, regardless of whether applied retroactively or not.

104.   The Company wrongfully included a liability for Accrued retirement benefits of over $5 million on its Balance Sheet for 2020, reducing Simones' Full

Retirement Benefit calculation by more than $1.5 million if the 2020 Balance Sheet were utilized.

105.   To reduce its payout to Simones, the Company also included on its 2020 Balance Sheet a Paycheck Protection Program ("PPP") loan as a liability, in the amount of approximately $1,639,600, even though Jerde knew at the end of 2020 that the loan either had been or would be forgiven, as designed by Congress.

106.   The result of leaving the PPP liability on the 2020 Balance Sheet was to reduce the Full Retirement Benefit for Simones, if calculated based on 2020 financial statements, by approximately $600,000.

**The Company Changes its Position on the Definition of "Book Value" with an Intent to Deprive Simones of his Full Retirement Benefit**

107.   The Plan Agreement does not specifically define book value in writing nor specify in writing at which point in time book value shall be measured to determine the Full Retirement Benefit.

108.   At the time of the execution of the Plan, the Company and the signators referred to "book value" as assets less liabilities on the Company's Balance Sheet, utilizing the calculations to determine Balance Sheet values in the same way the Company had for years.

109.   There was no intent at the time of the adoption of the Plan that the amount to be paid upon transfer of the shares back to the Company would be reduced as a result of the adoption of the Plan.

110.   When a different shareholder, Paul Senzaki, retired in 2019, the Company calculated his potential retirement benefits under Prong Two by subtracting liabilities from assets on the Company's prior year (*i.e.*, 2018) Balance Sheet.

111.   Simones reasonably relied on the Company's calculations for Mr. Senzaki as confirmation of how his own retirement benefits would be calculated.

112. Many internal communications confirm the parties' intent and expectation that Simones' Full Retirement Benefit would be based on the already completed 2019 financial statements and the book value easily derivable therefrom by subtracting liabilities from assets without adjustment for the Accrued retirement benefits.

113. For instance, on July 23, 2020, Mr. Martinkovic emailed Ms. McKerrow [Poulos] explaining "Book value is Assets-Liabilities=Book Value;" putting book value at $8.554M; and confirming Simones' "payout" at $3M. A true and correct copy of this email is attached as Ex. I.

114. Nonetheless, Jerde has asserted after the fact that the parties intended "book value" to mean that if a participant whose Full Retirement Benefit would be calculated under "Prong Two" retires, then the Company would have liabilities recalculated by both an accounting firm and an actuarial firm to include the amount due to that participant (and other Participants) under the Plan.

115. That interpretation goes against the evidence, does not comply with legal standards for contract interpretation, is illogical and unworkable, and represents a blatant change in position for the Company.

**The Company Informs Simones of its Committee**

116. Until June 10, 2021, Simones was unaware of any Committee appointed pursuant to Plan section 4.1.

117. On June 10, 2021, by letter, Simones was informed that the Committee included Paul Martinkovic, Jon Niiro, Phil Kim, and Mark Liu.

118. The Company's letter containing its final determination of Simones' Full Retirement Benefit makes no mention of the Committee. The letter is signed by Mr. Martinkovic. The letter purports to provide "the Company's" determination.

119. The "Committee" does not appear to have been involved in, let alone in charge of, construing and interpreting the terms and provisions of the Plan Agreement.

120.   Although the Plan Agreement states that the Committee has the "power" to construe and interpret the terms of the Plan, because the Committee did not participate in construction or interpretation of the Plan, Jerde's interpretation cannot be granted deference.

121.   Jerde's interpretation of the Plan's terms can also not be granted deference because Jerde and others acted in bad faith.

**Jerde Fails to Make the Initial Payment Due Simones Under the Plan**

122.   Simones' termination date from the Company was December 18, 2020.

123.   75 days after Simones' termination of employment was no later than March 3, 2021.

124.   Consistent with the Company's efforts to deprive Simones of benefits, Simones received no benefits from the Plan as of March 3, 2021.

125.   In fact, Simones did not receive any benefits until March 30, 2021.

**The Company Fails to Pay the Promissory Note**

126.   The Plan and the 2016 Shareholders Agreement, read together, call for the Company to purchase shares of a retiring shareholder who held shares as of May 2016 at $200 per share "or such greater amount as shall be determined by the Board in its sole discretion." 2016 Shareholders Agreement (Ex. D) ¶ 1.8.

127.   Simones was notified via a letter dated January 11, 2021 that the Company elected to purchase his shares as of February 11, 2021 for $200 per share.

128.   Simones owned 925 shares.

129.   $200 multiplied by 925 shares is $185,000.

130.   The Company paid 50% of the $185,000 up front and executed a Secured Promissory Note for the balance.

131.   The Company signed a Secured Promissory Note dated February 11, 2021. The value of the promissory note was one half of 925 shares times $200 per share, or $92,500. A true and correct copy of the Secured Promissory Note is attached as Ex. J.

132.   The Secured Promissory Note called for the Company to pay Simones $92,500 plus interest in 12 consecutive quarterly installments of $7,708.33 plus interest beginning on April 1, 2021 and continuing thereafter the first of each consecutive calendar quarter. (Ex. J.)

133.   Jerde did not make the payment due April 1, 2021.

134.   Jerde did not make the payment due July 1, 2021.

135.   After Jerde missed the second payment, Simones, through counsel, notified Jerde of the Event of Default. Simones exercised his right to declare all indebtedness under the Note immediately due and payable and sought interest per the Note at the maximum rate permitted by law.

136.   After receiving notice of the Event of Default, Jerde paid Simones the balance of the note.

137.   Jerde's failure to pay the payments due under the Secured Promissory Note further evidence the Defendants' intent to deprive Simones of benefits.

**Jerde Fails to Notify Simones of its "Independent CPA" Despite Promising to Do So**

138.   In a letter of June 10, 2021 to counsel for Simones, Mr. Martinkovic stated that: "in connection with the assessment of Simones' appeal, please be advised that the Committee is in the process of engaging an independent expert CPA with whom the Committee may confer regarding the Company's calculation of the Full Retirement Benefit. The Company will notify you promptly once it has engaged the CPA."

139.   Once again acting in bad faith, notwithstanding Mr. Martinkovic's commitment to notify Simones "promptly" of the engagement of an independent expert CPA, Jerde did not notify Simones of the identity of the alleged "independent expert" until the in-person hearing conducted on August 12, 2021.

140.   Moreover, the CPA presenting at the hearing was not "independent," but rather an advocate for the Company.

**Jerde Fails to Comply with Simones' Request for Information**

141.  Simones' claim for benefits, dated December 21, 2020, requested "copies of all documents, records, and other information relevant to Simones' claim for benefits" and cited 29 CFR § 2560.503-1(h)(2)(iii). The Company produced no documents or records.

142.  Simones, through counsel, reiterated the request for "all documents, records, and other information relevant to Simones' claim for benefits," again citing 29 CFR § 2560.503-1(h)(2)(iii), via a letter dated January 14, 2021. The Company produced no documents or records.

143.  Simones, through counsel, reiterated the request for "all documents, records, and other information relevant to Simones' claim for benefits," again citing 29 CFR § 2560.503-1(h)(2)(iii), via a letter dated March 8, 2021. The Company produced no documents or records.

144.  On March 30, 2021, the Company, through Mr. Martinkovic, sent its denial of Simones' claim and an accompanying calculation of Simones' Full Retirement Benefit of $2,090,037. Mr. Martinkovic also sent 46 pages of documents related to the Company's position, well short of the documents requested.

145.  By letter dated May 14, 2021, Simones, through counsel, appealed the (partial) denial of Simones' claim for benefits. The letter reiterated the request for "copies of all documents, records, and other information relevant to Simones' claim for benefits." Due to the Company's failure to provide the requested documents for months, the May 14, 2021 letter included specificity in the documents requested:

> For instance, the following documents pertain to the claim for benefits and are requested: minutes or notes from Board of Directors meetings at which the Amended and Restated Shareholders Agreement or the Second Amended and Restated Shareholders Agreement were discussed; minutes or notes from Board of Directors meetings or shareholder meetings at which the potential or actual adoption of the SERP was discussed; all materials relating to whether the company or the shareholders should or should not adopt the SERP and amend the shareholders agreement in 2016, whether concerning the tax effects or other implications, including all communications and presentations; all materials concerning how the SERP and the Second Amended and

Restated Shareholders Agreement relates to the Amended and Restated Shareholders Agreement; and minutes or notes from Board of Director meetings wherein benefits under the SERP, to Mr. Simones or any other retiree or potential retiree, were discussed. Any documents concerning how the company has interpreted the term "book value," whether pertaining to the SERP, pertaining to any version of the shareholders agreement, or in any other context, also pertain to Mr. Simones' claim and are requested. For the avoidance of doubt, all communications regarding the determination of Mr. Simones benefits under the SERP – either the original calculation or the revised calculation(s) – are also requested.

146.   On June 14, 2021, the Company produced 1,355 pages of documents, still short of the totality of the documents requested.

147.   On June 21, 2021, Simones, through counsel, requested copies of several categories of additional documents, including the Board resolution regarding the calculation of Simones' benefits in July 2020, which the Company had not yet provided.

148.   Jerde produced approximately 600 pages of additional documents on or about July 22, 2021.

149.   Jerde first produced the Board resolution, indisputably a highly relevant document, and attached as Exhibit H, on July 22, 2021.

150.   Due to the Company's delay in producing documents, instead of having the opportunity to review documents when preparing his appeal, which was dated May 14, 2021, Simones instead was relegated to reviewing nearly 2,000 pages of documents produced <u>after</u> his appeal was sent and having only the opportunity to present argument at the hearing held August 12, 2021.

151.   Jerde produced over 200 pages of additional documents during August 2021, after the hearing. Simones believes that Jerde still has not produced all relevant documents.

152.   The Company thus failed to comply with the Plan Agreement's provisions regarding production of documents on request.

153.   The Defendants, and each of them, failed to comply with the procedural requirements set out in 29 C.F.R. § 52560-503-1(h)(2)(iii), and the Plan's terms, to

provide Plaintiff, upon request, with all documents, records, and other information relevant to the claimant's claim for benefits.

### Exhaustion of Remedies

154. Pursuant to the dispute resolution provisions of the Plan, Plaintiff filed a formal claim for benefits under the Plan with Jerde on or about December 21, 2020. Plaintiff's claim was denied on or about March 30, 2021.

155. Plaintiff timely filed an appeal of the denial on or about May 14, 2021.

156. An in-person hearing regarding Simones' appeal occurred August 12, 2021.

157. However, Mr. Liu and Mr. Kim, ostensibly part of the Committee, did not attend the hearing in person, by video or audio.

158. As such, half of the Committee members did not even attend the hearing at which Simones, through counsel, presented extensive information about his appeal.

159. The failure of Committee members to attend the hearing is further evidence of the bad faith involved in the decision to deny Simones' benefits.

160. Simones' appeal was denied by "the Company" by letter dated August 31, 2021 and signed by Paul Martinkovic.

161. Plaintiff has exhausted his administrative remedies.

162. Mr. Martinkovic and/or the Committee were acting under a conflict of interest in determining Simones' Full Retirement Benefit, because, among other reasons, they acted in a dual role as the ERISA plan administrator and as representatives of the payee of the benefits.

163. Moreover, the decision to deny Simones' full benefits allowed the Company to avoid significant unfunded cash expenses. The denial of Simones' full benefits could benefit Mr. Martinkovic, other shareholders, and other committee members by increasing funds available to award them bonuses or other compensation or benefits.

164. The decision to deny Simones' claim was made in bad faith and was arbitrary, capricious, unreasonable, illogical, and implausible.

## FIRST CAUSE OF ACTION

### (Failure to Pay Benefits Due under the Plan – Against All Defendants)

165. Plaintiff incorporates by reference each of the foregoing numbered paragraphs of this Complaint.

166. Simones was a member of senior management of Jerde for over 25 years, he was a participant in the Plan, and his benefits under the Plan vested.

167. Plaintiff properly made a timely claim for benefits of $3,133,668.

168. Simones' claim for benefits was denied in part. He was informed his benefits would be only $2,090,037.

169. Simones timely appealed the denial, in part, of his benefits due under the Plan.

170. Simones' claim for benefits was again denied in part after his appeal.

171. Plaintiff exhausted the Plan's administrative appeals process.

172. Plaintiff is entitled to benefits of no less than $3,133,668 under the Plan's terms, but has been deprived of no less than $1,043,631 of his benefits.

173. Defendants, and each of them, failed to cause the Plan to pay a portion of benefits due under the terms of the Plan, thereby depriving Plaintiff of benefits due and giving rise to this action under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

174. Simones requests this court award Simones the benefits he was wrongfully denied, in an amount no less than $1,043,631 plus attorney fees and legal costs, pre- and post-judgment interest.

## SECOND CAUSE OF ACTION

### (Equitable Estoppel – Against All Defendants)

175. Plaintiff incorporates by reference each of the foregoing numbered paragraphs of this Complaint.

176. By the conduct alleged in the paragraphs above, the Defendants, and each of them, either purposefully or negligently led Plaintiff to reasonably believe that his benefits would be $3,133,668. Therefore, Defendants are equitably estopped from asserting that Plaintiff is not entitled to those benefits.

177. Simones requests this court award Simones the benefits he was wrongfully denied, in an amount no less than $1,043,631 plus attorney fees and legal costs, pre- and post-judgment interest.

## THIRD CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing – Plan)

178. Plaintiff incorporates by reference each of the foregoing numbered paragraphs of this Complaint.

179. Defendants have violated the implied covenant of good faith and fair dealing contained in the Plan Agreement. As a result, Plaintiff has been damaged in an amount to be determined at trial, but believed to be in excess of $1,000,000.

180. Simones requests this court award Simones the benefits he was wrongfully denied, in an amount no less than $1,043,631 plus attorney fees and legal costs, pre- and post-judgment interest.

## FOURTH CAUSE OF ACTION

### (Breach of Contract (Plan) – Against Jerde Partnership, Inc.)

181. Plaintiff incorporates by reference each of the foregoing numbered paragraphs of this Complaint.

182. The Plan Agreement constitutes a valid contract.

183. Plaintiff performed under the contract.

184. Defendant Jerde breached the Plan Agreement by failing to award Simones the benefits to which he is entitled.

185. Plaintiff was damaged by Jerde's breach in amount no less than $1,043,631 plus attorney fees and legal costs, pre- and post-judgment interest.

## FIFTH CAUSE OF ACTION

### (Declaratory Relief – Against All Defendants)

186.   Plaintiff incorporates by reference each of the foregoing numbered paragraphs of this Complaint.

187.   An actual controversy has arisen and now exists between Simones, on the one hand, and Defendants, on the other, concerning the proper calculation of Simones' Full Retirement Benefit under the Plan Agreement.

188.   Simones desires a judicial declaration of his rights and remedies under the Plan.

## SIXTH CAUSE OF ACTION

### (Breach of Contract (Bonus Agreement) – Against Jerde Partnership, Inc.)

189.   Simones and Jerde were parties to an agreement that each year the Company would pay bonuses to its shareholders if the Company had more than $2 million in cash as of November.

190.   Pursuant to the agreement, the Compensation Committee of Jerde's Board of Directors, or the full Board of Directors, routinely voted to distribute bonuses in years that the Company met this criterion.

191.   Simones' annual compensation since 2016 consisted primarily of these awarded bonuses, which comprised over 60% of his non-deferred compensation since 2016.

192.   In November 2020, the Company had more than $2 million cash on hand.

193.   The Company had the most cash on hand in November 2020 than it had at that point in the year in the history of the Company.

194.   Simones, a member of the Compensation Committee of the Board of Directors, voted to distribute bonuses in December 2020 in accordance with the agreement.

195.   However, the other members of the Compensation Committee – Mr. Martinkovic and Mr. Liu, both also members of the Plan Committee – voted against distributing bonuses in December 2020.

196.   Mr. Martinkovic's and Mr. Liu's votes against the award of bonuses in November 2020 was motivated by a desire to deprive Simones of his owed bonus.

197.   Mr. Martinkovic and Mr. Liu voted against the award of bonuses in December 2020 as a result of their conflict of interest.

198.   The Company did not award Simones his bonus in 2020.

199.   The Company's failure to award Simones his bonus in 2020 breached the agreement.

200.   Simones was harmed by this breach in an amount to be determined at trial, but believed to be at least $680,000.

## SEVENTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing – Bonus Agreement – Against Jerde Partnership, Inc.)

201.   Plaintiff incorporates by reference numbered paragraphs 189-200 of this Complaint.

202.   Jerde violated the implied covenant of good faith and fair dealing within the bonus agreement. As a result, Plaintiff has been damaged in an amount to be determined at trial, but believed to be at least $680,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court conduct an evidentiary hearing and conduct a de novo determination of Simones' benefits under the Plan, and that the Court order judgment in his favor and against Defendants as follows:

a.   For damages in an amount no less than $1,043,631 to compensate for denied Plan benefits;

b.     For a declaration of Simones' rights under the Plan Agreement as set forth above;

c.     For Jerde to honor its retroactive obligation under the Plan by paying to Plaintiff all delinquent payments together with appropriate interest;

d.     For Jerde to pay Simones' attorney fees and all legal costs that Plaintiff has incurred in connection with this matter pursuant to ERISA § 502(g); 29 U.S.C. §§ 1132(g);

e.     For damages in an amount no less than $680,000 to compensate for denied bonus compensation;

f.     For Jerde to pay prejudgment interest at the maximum legal rate from the point that Simones was entitled to have his benefits paid to the date of the Court's judgment;

g.     For Jerde to pay post-judgment interest from the date of the Court's judgment to the date that the benefits are paid;

h.     For all Defendants to be jointly and severally liable for all damages and relief awarded;

i.     For such other and further relief as this Court may deem just and proper.

Dated:  October 19, 2021                SOLOMON WARD SEIDENWURM & SMITH, LLP

By:  s/William V. Whelan
     _____
     WILLIAM V. WHELAN
     DEBORAH A. YATES
     Attorneys for Plaintiff John Simones